ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
SEP - 6 2005
U.S. COURT OF FEDERAL CLAIMS

Government Telecommunications, Inc.
4500 Southgate Place, Suite 300
Chantilly, Virginia 20151,

Plaintiff,

v.

The United States,

Defendant.

05 - 966 C

## COMPLAINT

COMES NOW the Plaintiff, Government Telecommunications, Inc. (GTI), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Postal Service (USPS or Postal Service), and states as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. GTI brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, GTI brings this action directly to the United States Court of Federal Claims within 12 months of the imputed "deemed denied" date of the Contracting Officer's Final Decision.

## PARTIES

3. The Plaintiff, GTI, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Chantilly, Virginia. Among

other things, GTI contracts with various United States governmental agencies, including the Postal Service, for the design and installation of electrical and telecommunication equipment infrastructure. One of GTI's specialties is the performance of such installation on multiple, geographically diverse, locations. GTI is a wholly owned subsidiary of Computer Equity Corporation. Computer Equity Corporation is a wholly owned subsidiary of Applied Digital Solutions, Inc., headquartered in Delray Beach, Florida.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the Postal Service.

## NATURE AND SUMMARY OF ACTION

5. This action is brought by GTI pursuant to the provisions of the CDA, 41 U.S.C. § 609, seeking recovery against the government for its improper exercise of termination for convenience authority under Contract No. 3AAERD-03-P-6080 (the Contract) with the Postal Service. The termination for USPS's purported convenience was improper because: (1) there were no changed circumstances warranting such action; (2) the Postal Service terminated the Contract to get a better bargain from other sources; and (3) upon information and belief, the Contract was terminated in retaliation for GTI's lawful and proper submission of Requests for Equitable Adjustment (REAs) to recover costs incurred by it in response to certain actions, inactions, or other conduct by the USPS. These actions constitute independent grounds for finding that USPS breached the Contract. The total amount claimed by GTI in this action is the profit that GTI would have made on the improperly terminated work scope, $1,820,000, plus interest as allowed under the CDA.

6. This action is related to Civil Action Nos. 05-463C (filed April 11, 2005), 05-491C (filed April 22, 2005), 05-547C (filed May 13, 2005) and 05-592C (filed June 2, 2005)

because such actions and the instant action all arose under or otherwise relate to the Contract. However, the instant action is separate and distinct from the other actions because while the matters complained of in the other actions all seek recovery of the increased costs of Contract performance, the instant action seeks the recovery of lost profits due to Contract breach. Accordingly, GTI does not request that this action be consolidated with the other actions.

## STATEMENT OF FACTS

*Contract Award and Overview*

7. On April 7, 2003, the USPS issued RFP 3AAERD-03-A-1200, accompanied by a statement of work (SOW) defining the requirements for upgrading the existing baseband local area network wiring at up to 62 mail processing plants (sites) and 12 co-located administrative networks to meet current wiring standards for "USPS structured wiring." These initial 62 sites came to be known as the "Phase I" sites. The additional 88 sites added via Amendment 2 to the solicitation on April 24, 2003 came to be known as the "Phase II" sites.

8. According to the SOW, the scope of work for this program, termed the Mail Processing Infrastructure or MPI program by USPS, included pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation.

9. On June 20, 2003, the Postal Service awarded GTI the Contract. GTI began performance shortly thereafter.

*Factual Background*

10. The key facts underlying the instant action took place in January through May 2005. On January 4, 2005, one of the bidders that had lost to GTI when bidding initially on the Contract, A&T Systems (A&T), announced via a press release that it had received an "award

from the United States Postal Service of a contract for upgrading the existing base band local area network wiring at . . . 20 sites and then intends to expand the effort to 76 identified sites."

11. On January 7, 2005, GTI submitted its "Full Quantities of Program Management" REA to USPS. This was the fifth of six REAs to be submitted by GTI which, in the aggregate, totaled $6.9 million.

12. On January 10, 2005, the Postal Service contacted GTI and broached the subject of a possible termination of the Contract with GTI for the convenience of USPS. USPS requested an estimate from GTI as to the magnitude of GTI's recoverable costs that might be included in a settlement proposal. GTI mentioned that one of the items that would need to be taken into consideration in a termination settlement was the inventory that GTI and its material supplier, Anixter, had on hand.

13. On January 11, 2005, GTI sent an e-mail response to USPS in which GTI acknowledged USPS's right to terminate the Contract at any time for its convenience, stated that the company would cooperate fully in such an event, and provided a preliminary estimate of GTI's recoverable costs.

14. On January 13, 2005, GTI submitted its "Site Complexity" REA to USPS.

15. On January 18, 2005, GTI received a letter from USPS dated January 14, 2005 stating that USPS was terminating the Contract for convenience, effective immediately.

16. On February 28, 2005, GTI sent USPS an interim response to USPS's Notice of Termination. The interim response made specific reference to the inventory of materials and requested USPS direction on the disposition of the inventory.

17. In early March 2005, Anixter advised GTI that Anixter had been in conversations with A&T about Anixter's providing materials and logistics support for A&T's 20 USPS sites.

A&T had indicated to Anixter that USPS was planning to award 20 sites at a time, and that the award of additional sites would be contingent upon A&T's performance on the first 20. Anixter also said it learned from these discussions with A&T that one of the subcontractors they were planning to use was Town & Country Electric, which had done installs for GTI at four sites in Phases I and IIa.

18. Also in early March 2005, another of GTI's subcontractors, Larry L. Read Electric (Read), advised GTI that Read had been asked by the Postal Service whether Read would be interested in submitting quotes to do site surveys at five sites that had been deferred from Phase IIa into Phase IIb. Read had performed installation work for GTI at 40 sites in Phases I and IIa.

19. On March 31, 2005, GTI submitted its termination settlement proposal to USPS. Included therein was information regarding approximately $359,000 of inventory that had been acquired during 2004 in anticipation of GTI doing Phase IIb installs.

20. Also on March 31, 2005, Read contacted GTI about the possibility of purchasing some of the GTI/Anixter inventory for one or more of the five sites on which Read had, by that time, completed the site surveys and had submitted price quotes to USPS. Further discussions on this subject took place between others at GTI and Read over the next several days. Read told GTI that USPS had advised it to "check with GTI" about fulfilling their materials requirements for these sites.

21. On April 7, 2005, Anixter advised GTI that Anixter had arranged to sell a portion of the inventory it was holding to A&T, and that as a result the inventory balance had been reduced by approximately $122,000. The next day, GTI sent an e-mail to the USPS contracting

officer requesting written concurrence from USPS on having GTI/Anixter attempt to dispose of the inventory via sale to contractors who would be continuing on with the program.

22. On April 15, 2005, Read told GTI that it was expecting to receive orders from USPS for five sites, and that the Postal Service had mentioned that it was interested in talking with Read about doing the installs at up to another 20 sites.

23. On April 19, 2005, USPS informed GTI that it had heard that GTI had some inventory that could be used by other contractors in the program, and that USPS wanted to discuss and get additional information about the possibility of arranging for that.

24. On April 20, 2005, GTI advised USPS that the inventory had been disclosed and catalogued in the termination settlement proposal submitted by GTI on March 31, 2005, and that a request also had been made of the contracting officer on April 8, 2005 for something in writing from USPS concurring with the possible sale of those materials to USPS's new contractors.

25. On April 21, 2005, Read advised GTI that the Postal Service had asked Read to take on another 11 sites. The next day, a representative of Network Products, Inc. advised GTI that USPS had advised Network Products that USPS was thinking about contracting directly with installation companies (such as Read) on a regional basis to complete the remaining installations.

26. On April 26, 2005, Town & Country Electric confirmed to GTI that it was doing six of the 20 sites that had been awarded to A&T, and that the 40 percent – 60 percent inspections at five of those sites were scheduled to occur over the next couple of weeks.

27. On May 3, 2005, Read advised GTI that it had received orders from USPS for five sites.

28. On June 2, 2005, GTI submitted to the Contracting Officer its certified claim seeking lost profits totaling $1,820,000. Since that submission, more than 60 days has elapsed

without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

*Damages*

29. GTI valued the totality of Phase II work to be approximately $25 million. Prior to termination, GTI completed approximately $11 million of that Phase II work scope. Accordingly, upon information and belief, the value of the terminated work scope is $14 million.

30. On average, GTI planned to make 10 percent profit on the Contract. However, because much of Contract work scope was of a repetitive nature, GTI expected that work in the later portions of Contract work would be performed more efficiently than work performed during the early portions of the Contract due to the application of "learning curve" theory to the work.

31. When this "learning curve" phenomenon is taken into consideration, GTI estimates that in order to achieve a 10 percent profit on average, its profit margin at the beginning of Contract performance would be 7 percent and its profit margin during the later phases of the project would be 13 percent. Given that the deleted work represents late-stage Phase II installs, GTI would be entitled to apply a 13 percent profit rate to that work to "make up" for the presumed 7 percent net profit on the early Phase I work.

32. Application of the 13 percent net profit rate to the wrongfully deleted work scope of $14 million results in lost profits of $1,820,000 that GTI is entitled to recovery from the Postal Service.

33. The fact that GTI would have made a reasonable profit on the terminated work scope was clearly foreseeable to USPS at the time of the improper act of termination.

34. GTI is a well established company with a successful track record.

35. The marginal net profit rate claimed by GTI in this action is in line with profit rates earned by GTI for work of a similar nature.

**COUNT I**

**Breach of Contract: No Changed Circumstances**

36. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

37. The Competition in Contracting Act (CICA), enacted in 1984 by Pub. L. No. 98-369, 98 Stat. 1175 (codified in various sections of 10, 31, and 41 of the United States Code) does not apply to USPS contracting activities.

38. For those contracting environments where the protections of CICA are absent, such as the instant case here, there must exist changed circumstances before the government can properly exercise its termination for convenience authority.

39. At the time of the issuance of the termination notice (issued on January 14, 2005 and received by GTI on January 18, 2005), work on the MPI program was proceeding just as it always had: the work scope was the same, the parties were the same, the priorities were the same, and the role of the MPI program within the overall mission of the USPS was the same. The only thing different was that GTI had begun to submit several REAs to recover costs caused by actions, inactions, or other conduct of the Postal Service. Of course, that legitimate exercise of GTI's Contract rights, however, is a normal incident of any construction or installation program and certainly cannot be labeled a change in circumstances. The only other difference was the Postal Service's recalcitrance in resolving open commercial issues with GTI. Since this is an endogenous circumstance brought on by USPS's own conduct, this, too, cannot be a change in circumstances.

40. Since there were no changed circumstances then existing that warranted the Postal Service's termination for convenience of the Contract, that action exceeded the Postal Service's termination for convenience authority and thus constituted a material breach of the Contract.

41. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages of at least $1,820,000.

42. GTI has fulfilled all conditions precedent to recovery under this cause of action, has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests in Count I that the Court enter judgment against the Postal Service in the amount of at least $1,820,000, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

**COUNT II**

**Breach of Contract: Cannot Terminate to get Better Bargain from Other Sources**

43. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 42 as if fully set forth herein.

44. Controlling law holds that a contracting officer cannot terminate for convenience in bad faith, for example, simply to acquire a better bargain from another source.

45. The Postal Service has, in fact, contracted directly with GTI's subcontractors to perform portions of the terminated MPI work scope. In so doing, USPS has, in effect, cut out the "middleman" and, upon information and belief, lowered its overall program costs.

46. Indeed, the "better bargain" that USPS has acquired extends beyond just the direct cost reductions realized as a result of GTI being out of the picture. USPS and its contractors will also benefit throughout the remaining duration of the MPI program from the wrongful

conversion of certain program-specific GTI work products that were widely used and disseminated during the time GTI was involved in the MPI program. These are materials that would otherwise need to be devised or developed by USPS and/or any of its contractors to properly perform the MPI work, and their present availability to contractors performing the terminated work scope represents a substantial savings with respect to successful completion of that work. They include: (1) an 80-page manual prepared by GTI entitled "Mail Processing Infrastructure Installation Guide;" (2) a 54-page document prepared by GTI entitled "Safety and Health Guide;" and (3) soft copies of tools to handle functions such as scheduling, engineering, status reporting, and change order tracking.

47. By engaging in conduct such as that described above, USPS's termination for convenience is tinged with the taint of bad faith. Accordingly, that action constitutes a material breach of the Contract.

48. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages of at least $1,820,000.

49. GTI has fulfilled all conditions precedent to recovery under this cause of action, has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests in Count II, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service in the amount of at least $1,820,000, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

**COUNT III**

**Breach of Contract: Cannot Terminate to Retaliate Against a Contractor's Proper Exercise of its Contract Rights**

50. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51. The record demonstrates that USPS's termination for convenience was a direct response to GTI's submission of REAs for upward adjustment in the Contract price. Indeed, USPS's January 14, 2005 Notice of Termination letter (received by GTI on January 18th) leads off as follows:

> This letter is to inform you that we have decided to terminate our above referenced [sic] contract for convenience. Unfortunately our bilateral discussions since July 2004, [sic] have not resulted in a settlement of our differences regarding contract terms and conditions. We are also concerned that continuing with this contract with these disputes may impact timely delivery and other Postal programs that rely upon the Mail Processing Infrastructure program for structured wiring.

It appears that the Postal Service simply decided that it had grown tired of dealing with GTI on contract administration matters and pulled the plug on the Contract just to avoid further claims-related discussions.

52. Linking contract termination with contract claims is highly improper and runs directly contrary to formal Office of Federal Procurement Policy (OFPP) policy. In an April 1, 2002 memorandum to agency senior procurement executives, the OFPP Administrator stated that the "filing of protests, the filing of claims, or the use of Alternative Dispute Resolution, must not be considered by an agency in either past performance evaluations or source selection decisions." The directive further states that "contractors should feel free to avail themselves of the rights provided to them by law" and directed agency procurement heads to "emphasize" to source selection officials that contractors: (1) may not be given "downgraded past performance

evaluations" for availing themselves of their protest, claims, or contractual rights, and (2) may not be given more "positive" past performance scores simply because they refrained from filing protests or claims. The OFPP directive essentially codifies as policy the recent decisions of the U.S. Comptroller General on these points.

53. What the Postal Service has done here is even more reprehensible than the actions proscribed by the OFPP directive. Here, GTI was midway through performance of a contract that presented the business expectancy of profit on the remaining work scope. USPS thwarted this business expectancy through Contract termination simply because, upon information and belief, it did not feel like engaging in good-faith discussions in an effort to resolve commercial matters regarding contract administration.

54. Retaliation against a contractor in this manner is *prima facie* evidence that USPS's termination of GTI's Contract was motivated by malice and/or actuated by animus. Thus, the Postal Service's termination for convenience was an improper exercise of its termination for convenience authority and constituted a material breach of the Contract.

55. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages of at least $1,820,000.

56. GTI has fulfilled all conditions precedent to recovery under this cause of action, has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests in Count III, in the alternative to the relief requested in Counts I and II, that the Court enter judgment against the Postal Service on in the amount of at least $1,820,000, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 6th day of September 2005.

Respectfully submitted,

**Government Telecommunications, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff

Of Counsel:

Michael Krawitz, Esq.
General Counsel, Applied Digital